FILED

2021 Apr-19  PM 03:41
U.S. DISTRICT COURT
N.D. OF ALABAMA



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **CURTIS BAKER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: 5:21-cv-00382-HNJ** |
| ) | |
| **CITY OF MADISON, ALABAMA,** ) | |
| **DANIEL NUNEZ and DION HOSE,** ) | |
| ) | |
| **Defendants.** ) | |

BRIEF OF DION HOSE IN SUPPORT OF MOTION TO DISMISS

Defendant Dion Hose submits the following brief in support of his pending

motion to dismiss plaintiff Curtis Baker's complaint.

## I. Allegations of the Complaint

This case arises out of Baker's March 16, 2019 interaction with City of

Madison ("City") police officers Daniel Nunez and Dion Hose. On March 12, 2021,

Baker filed a pro se complaint against the City, Officer Nunez, and Officer Hose in

the United States District Court for the Northern District of Alabama. (Doc. 1).

Baker allegedly suffers from epilepsy. (Id., ¶ 14). Baker alleges in his

complaint that on March 16, 2019, he was in an automobile accident after suffering

a seizure. The complaint avers that shortly after the accident, paramedics, Officer

Nunez, and Officer Nunez arrived on the scene. (Id., ¶¶ 20-21). Baker alleges that

upon the arrival of emergency responders, he was still having a seizure. (Id., ¶¶ 24-

25). According to Baker's version of events, officers told him to get on a gurney and go to the hospital, but he refused to do so. (Doc. 1, ¶¶ 26-27). Baker alleges that his friend, who was present at the scene, advised Officer Nunez and Officer Hose that Baker was having a seizure and could not fully understand them. (Id. ¶¶ 28-29). Baker alleges that paramedics on scene similarly advised Officers Nunez and Hose. (Id., ¶¶ 30-31). According to Baker, Officer Nunez then tased him to make him get on the gurney (id., ¶ 36), and, when he still refused to get on the gurney, Officer Nunez tased him again. (Id., ¶¶ 37-38). Baker denies that he was "suspected of any crime," "combative with the police," "in danger from traffic," or "endangering anyone." (Id., ¶¶ 3, 32-34, 35). Baker alleges that after the incident, he asked the City to investigate and reprimand Officer Nunez and Officer Hose. (Id., ¶ 45). Baker avers that the City advised Baker in writing that Officer Nunez's and Officer Hose's conduct "was consistent with Municipal policy." (Id., ¶ 49).

Baker alleges three claims in his complaint under 42 U.S.C. § 1983. In Count I, Baker alleges that Officer Nunez used excessive force when he tased him in violation of the Fourth and Fourteenth Amendments. (Doc. 1, ¶¶ 54-57). In Count II, Baker alleges that Officer Hose had an obligation to intervene to stop Officer Nunez's unconstitutional application of force. (Id., ¶¶ 58-61). Specifically, Baker alleges that Officer Hose had an obligation to prevent Officer Nunez from his first and second use of the Taser. (Id., ¶¶ 60-61). In Count III, Baker alleges that the City

2

is liable under § 1983 because the officers' conduct was "the result of the policy of Madison, Alabama, according to the admission of the City." (Doc. 1, ¶¶ 62-66). As indicated, the sole claim against Officer Hose is contained within Count II of the complaint.

## II. Body Camera Footage

As Baker states in his complaint, Baker's entire interaction with Officer Nunez and Officer Hose was recorded on the officers' body cameras. (Doc. 1, ¶¶ 4, 46-48; see Body Camera Footage of Officer Daniel Nunez ("Nunez Body Cam" or "Ex. A") and Body Camera Footage of Officer Dion Hose ("Hose Body Cam" or "Ex. B"), attached to Motion to Dismiss and Filed Conventionally with the Clerk of Court). Baker references the body camera footage several times in his complaint. Though not attached as an exhibit to the complaint, Baker alleges "that the video recording is a display of what happened, *i.e.*, Madison police using a tazer [sic] on a harmless Black man having a medical emergency simply because the Black man, who was not committing any crime, refused to accept the medical assistance that medical personnel themselves who were present on site were not insisting that he should receive." (Id., ¶ 48).[1]

---

[1] Multiple federal courts, including this one, have held that video recordings or similar media which are referenced but not attached to a complaint may be considered in a motion to dismiss. See, e.g., Nelson v. Lott, 330 F.Supp.3d 1314 (N.D. Ala. 2018) (Smith, J.) (reviewing body camera footage without converting motion to dismiss); Banks v. Huehnerhoff, 2021 WL 37644, at *2 (W.D. Wash. Jan. 5, 2021) (video of traffic stop) (holding that a court "may consider a video

The video shows that, at approximately 12:00 p.m. on March 16, 2019, Officer Nunez arrived on the scene of an automobile accident. (Ex. A, Nunez Body Cam, 12:00:22).[2] Officer Nunez exited his vehicle and approached Baker's vehicle. (Id., 12:00:30-12:01). When Officer Nunez arrived, paramedics were already on scene speaking with Baker, who was sitting in *the driver's seat* of a silver sedan. (Id., 12:01:00-12:01-15). While Officer Nunez recorded the tag number, paramedics brought a stretcher to the side of the vehicle and attempted to get Baker out of the car. (Id., 12:01:00-12:01:43). After Baker got out of the vehicle, paramedics repeatedly asked Baker to sit down on the stretcher. (Id., 12:01:25-12:02:30). When Baker refused to comply, Officer Nunez approached Baker. (Id., 12:02:30).

Over the next two and a half minutes, Officer Nunez asked Baker to sit on the stretcher at least 12 times to let paramedics check him out. (Ex. A, Nunez Body Cam,

---

recording in connection with a motion to dismiss without converting the matter to a summary judgment where…the recording is referenced in the complaint and its authenticity is not challenged."); Jackson v. Gatto, No. 13-CV-02516-CBS, 2014 WL 2743130, at *3 (D. Colo. June 17, 2014) (considering the audio/video tape referenced in complaint and submitted by defendants with motion to dismiss without converting to a motion for summary judgment); Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (disc containing photographs of web pages); King v. City of Los Angeles, 2017 WL 6885600, at *5 (C.D. Cal. June 6, 2017), R&R adopted, 2017 WL 6883915 (Nov. 15, 2017) (video referenced in attachment to complaint). Even if the Court finds the need to convert this motion to one seeking summary judgment, there is no need for discovery for Baker to respond to defendant's motion because the body camera footage conclusively establishes the facts surrounding Officer Nunez's use of force. Manners v. Cannella, 891 F.3d 959, 967 (11th Cir. 2018) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)) ('"[w]hen opposing parties tell two stories, one of which is blatantly contradicted by the record [as with a video recording of the incident,] so that no reasonable jury could believe it, a court should not adopt that version of the facts.").

[2] To develop a consistent timeline between the officers' body camera footage, citations to that footage will be made to the time listed on the bottom right of the footage.

12:02:30-12:05:00). Each time, Baker refused to comply. (Id.). During this time, Officer Nunez also asked Baker to provide his driver's license in accordance with Ala. Code § 15-5-30. (Id., 12:04:48-12:05:00); see also Scurlock v. State, 487 So. 2d 286, 289 (Ala. Crim. App. 1986) (holding that officer had right to detain and question potentially intoxicated motorist sitting in vehicle on side of road pursuant to Ala. Code § 15-5-30). Rather than complying, Baker ignored Officer Nunez and attempted to reassemble and smoke a broken cigarette. (Id., 12:03:48-12:04:55).

Paramedics and Officer Nunez then asked Baker to lean against the concrete wall or against his vehicle. (Ex. A, Nunez Body Cam, 12:05:07-12:05:25). In response, Baker shoved Officer Nunez and told him to "get off me man." (Id., 12:05:35-12:05:42). Baker then began searching his pockets for his phone and telling Officer Nunez to move so that he could "get in his mother fucking car." (Id., 12:05:42-12:06:00). At this point, Officer Nunez grabbed Baker's arm, but Baker soon broke free of Officer Nunez's grip. (Id., 12:06:00-12:06:09). At 12:06:10 p.m., Officer Nunez pushed Baker away from him and drew his Taser. (Id., 12:06:08-12:06:20). Baker then returned to his vehicle and sat down in the driver's seat. (Id., 12:06:25-12:06:28). Officer Nunez holstered his Taser, walked toward Baker's vehicle, and pulled him out of the driver's seat. (Id., 12:06:28-12:06:34). As Officer Nunez pulled Baker out of the vehicle, Baker *shoved* Officer Nunez. (Id., 12:06:30-12:06:34). Officer Nunez drew his Taser and fired it at Baker at 12:06:36 p.m. (Id.,

5

12:06:30-12:06:46). Ten seconds later, Officer Nunez removed the cartridge from the Taser, loaded a new cartridge, and again pointed it at Baker. (Id., 12:06:45-12:06:55). Officer Nunez holstered his Taser a minute later. (Id., 12:07:35-12:07:45). Officer Nunez never fired the Taser at Baker a second time. (Id., 12:06:36-12:11:00).

After firing the Taser, Officer Nunez ordered Baker to turn around at least 14 times. (Ex. A, Nunez Body Cam, 12:06:45-12:09:20). Each time, Baker refused to comply with Officer Nunez's commands. (Id.). At 12:08:51 p.m., Officer Hose arrived on scene. (Ex. B, Hose Body Cam, 12:08:48-12:08:53). At 12:09:05, nearly two and a half minutes after Officer Nunez fired his Taser, Officer Hose approached Baker. (Id., 12:09:00-12:09:13). When Officer Hose arrived, Baker said "Hey, Mr. Officer. Can y'all get this man? He just shot me in my stomach." (Id.). Officer Hose engaged Baker and assisted Officer Nunez in putting Baker's hands behind his back. (Id., 12:09:09-12:09:20). When Baker continued to resist, Officers Nunez and Hose, along with a third officer, took Baker to the ground. (Id., 12:09:18-12:09:30). During the altercation, Officer Hose's body camera fell off. (Id., 12:09:25-12:09:35). However, his camera remained on and recorded officers repeatedly instructing Baker to put his hands behind his back (six times) and to stop resisting (eight times). (Id., 12:09:25-12:11). On the ground, Baker continued to resist, repeatedly turning over onto his back to prevent officers from placing him in handcuffs. (Ex. A, Nunez Body

6

Cam, 12:09:30-12:10:45). By 12:11:35 p.m., officers were finally able to place Baker in handcuffs and sit him up on the road, effectively ending the altercation. (Id., 12:10:00-12:11:35). Ultimately, after Baker's mother came to the scene and explained his alleged medical condition, he was taken out of handcuffs and was allowed to leave. (Ex. A, Nunez Body Cam, 12:11:35-12:49:25).

### III. Argument

Baker's claim against Officer Hose is based not on his use of force, but his failure to intervene and prevent Officer Nunez from tasing him. (Doc. 1, ¶¶ 60-61). Based on the body cam footage, Baker is obviously mistaken about the number of times that Officer Nunez tased him. Baker was tased just once, before Officer Hose arrived. Therefore, Baker's claim against Officer Hose turns on whether he had an obligation to prevent Officer Nunez's single use of his Taser. For the reasons below, Baker's claims against Officer Hose fail as a matter of law.

A.   Officer Hose arrived after Officer Nunez tased Baker; therefore, he lacked the ability to prevent that use of force.

As this Court is well aware, an officer "who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for his nonfeasance." Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008). However, an officer "becomes liable for failing to intervene only when he or she 'is in a position to intervene and fails to do so.'" Bohanan v. Paulding County, Georgia, 479 F.Supp. 3d 1345, 1362 (quoting Priester

7

v. City of Riviera Beach, Fla., 208 F.3d 919, 924 (11th Cir. 2000)). Where an officer

arrives at the scene after the application of the allegedly excessive force, he cannot

be liable for failing to prevent that use of force. Militello v. Sheriff of Broward

Sheriff's Office, 684 F.Appx. 809, 815 (11th Cir. 2017) (dismissing excessive force

claim based on failure to intervene where officer was in different room at time of

incident); McClendon v. City of Sumiton, Alabama, No. 2:14-CV-00150-AKK,

2015 WL 2354187, at *8 (N.D. Ala. May 15, 2015) (dismissing excessive force

claim based on failure to intervene where officer arrived after plaintiff left scene).

In this case, Officer Hose never had an opportunity to prevent Officer Nunez

from tasing Baker. Officer Hose arrived at the scene at 12:08:51 and approached

Baker at 12:09:05. (Ex. B, Hose Body Cam, 12:08:48-12:09:13). By the time he

engaged with Baker, nearly two and a half minutes had passed since Officer Nunez

fired his Taser. (Id.). Therefore, because Officer Hose arrived after Officer Nunez

tased Baker, he was not "in a position to intervene" and prevent that use of force.

Accordingly, Baker's claim against Officer Hose must be dismissed.

B. Even if Officer Hose could have prevented Officer Nunez from tasing Baker,
   Officer Nunez did not use excessive force.

Even if Officer Hose had been present when the Taser was applied, Baker's

claim would fail. To prevail on a claim for excessive force based on a failure to

intervene, a plaintiff must not only establish that the officer was "in a position to

intervene," but also that the force applied was actually excessive. Crenshaw v. Lister,

8

556 F.3d 1283, 1293-94 (11th Cir. 2009); Smith v. City of Huntsville, No. 5:14-CV-00555-AKK, 2016 WL 5746216, at \*14 (N.D. Ala. Sept. 30, 2016). Baker cannot show that the use of the Taser by Officer Nunez constituted excessive force. Because Officer Nunez did not utilize excessive force, Officer Hose (who was not even present yet) cannot be liable for failing to intervene or prevent that use of force.

As a threshold matter, Officer Nunez was obviously justified in temporarily detaining Baker at the scene of the accident. Alabama law and pertinent Fourth Amendment jurisprudence required mere reasonable suspicion to detain Baker for an investigation. See, e.g., Cornelius v. City of Andalusia, 600 F. Supp. 2d 1209, 1220 (M.D. Ala. 2009) ("A traffic stop is a constitutional seizure under the Fourth Amendment if it is justified by reasonable suspicion in accordance with Terry v. Ohio."). The video makes clear that Officer Nunez approached Baker in the context of a traffic accident in which one vehicle (the one in which Baker was found in the driver's seat) rear-ended another. Ala. Code § 32-5A-3 makes it a misdemeanor offense to violate any of the "Rules of the Road" listed therein. Among the listed rules is the prohibition on following too closely. Section 32-5A-89(a) provides that "[t]he driver of a motor vehicle shall not follow another more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." Id. Given the circumstances, it would be reasonable for Officer Nunez to suspect that Baker's vehicle may have followed

9

too closely, giving rise to a legitimate basis for further investigation. This reasonable suspicion would only have been enhanced upon receiving information suggesting that the driver may have been under the influence, which is a violation of Ala. Code § 32-5A-191. Moreover, Officer Nunez asked Baker for his license several times, but he failed to comply with this request, in violation of Ala. Code § 32-6-9(a) and Ala. Code 15-5-30. Accordingly, Officer Nunez had reasonable suspicion to temporarily detain Baker. [3]

"Having made a lawful traffic stop, [Officer Nunez] was permitted to order the occupants out of the vehicle." United States v. Raveiro, No. 12-20859-CR, 2013 WL 12441457, at *5 (S.D. Fla. Apr. 4, 2013), R&R adopted, No. 12-20859-CR, 2013 WL 12441458 (S.D. Fla. Apr. 11, 2013) (citing Pennsylvania v. Mimms, 434 U.S. 106, 109-11 (1977)). If a subject refuses to adhere to commands to stay out of a vehicle, an officer may permissibly handcuff the subject and otherwise use reasonable force to enforce the commands. It has long been recognized that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989).

---

[3] Of course, even minor offenses, such as misdemeanors or traffic violations, may be the basis for a full custodial arrest. Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001). Therefore, regardless of whether Officer Nunez arrested or merely detained Baker, his seizure of Baker was justified.

In determining whether a particular use of force was reasonable, a court must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted. Draper v. Reynolds, 369 F.3d 1270, 1277–78 (11th Cir.2004) (citing Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir. 2002)). "The need for the application of force is measured by this test: 'the force used by a police officer…must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight.'" Id. at 1277, n.13 (quoting Lee, 284 F.3d at 1198).

The cases holding that a single application of a Taser on a non-compliant or belligerent suspect does not constitute excessive force are, in a word, legion. "[I]n a 'difficult, tense and uncertain situation' the use of a Taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force. Zivojinovich v. Barner, 525 F.3d 1059 (11th Cir. 2008) (quoting Draper, 369 F.3d at 1278). In fact, the Eleventh Circuit has endorsed Taser use over alternative methods of physical restraint: "Where a suspect appears hostile, belligerent, and uncooperative, use of a Taser might be preferable to a physical struggle causing serious harm to the suspect or officer." Smith v. LePage, 834 F.3d 1285, 1294 (11th Cir. 2016).

The Eleventh Circuit has specifically addressed the use of a Taser in the context of an officer enforcing traffic laws. In Draper, the plaintiff sued an officer

11

for excessive force after being tased during a traffic stop for an inoperative tag light.

Affirming the district court's order granting summary judgment, the court reasoned:

> [f]rom the time Draper met Reynolds at the back of the truck, Draper was hostile, belligerent, and uncooperative. No less than five times, Reynolds asked Draper to retrieve documents from the truck cab, and each time Draper refused to comply. Rather, Draper accused Reynolds of harassing him and blinding him with the flashlight. Draper used profanity, moved around and paced in agitation, and repeatedly yelled at Reynolds.

Draper, 369 F.3d at 1278. Similarly, in Buckley v. Haddock, the court affirmed the district court's ordering granting summary judgment in favor of a sheriff's deputy on an excessive force. 292 F. App'x 791, 794 (11th Cir. 2008). In that case, the court held that numerous factors justified the deputy's use of a Taser: "the incident occurred at night on the side of a highway with considerable passing traffic, "the deputy could not complete the arrest—that is, truly control plaintiff—because plaintiff was resisting," and "the deputy resorted to using the Taser only after trying to persuade plaintiff to cease resisting, after attempting to lift plaintiff, and after repeatedly and plainly warning plaintiff that a Taser would be used and then giving plaintiff some time to comply." Id.

An officer's decision to use a Taser is especially justified where the officer is engaged in a physical struggle with a suspect. For example, in Moore v. Gwinnett County, an officer tased the plaintiff after she refused seven commands to put her hands behind her back and "several minutes preceding the arrest ignoring [officers']

12

directives that she step outside." 805 F.Appx. 802, 808-09 (11th Cir. 2020). Affirming the district court's order granting summary judgment, the Eleventh Circuit noted that a "'single use of [a] Taser gun may well…*prevent*[] a physical struggle and serious harm' to officers in a tense situation where a suspect was repeatedly noncompliant." Id. at 809 (emphasis in original) (quoting Draper, 369 F.3d at 1278). However, "[t]his principle applies with even greater force here, where a physical struggle has ensued and the risk of officer harm is thereby heightened." Id.; see also Manners v. Cannella, 891 F.3d 959, 974-75 (11th Cir. 2018) (holding that use of Taser to "restrain, subdue, and handcuff Manners, whose resistance was evident from the outset," was not unconstitutionally excessive). When a suspect is a large individual, that only further justifies the use of a Taser. Manners, 891 F.3d at 967 (holding that tackling, punching, and tasing a "larger individual, who…actively resisted [officer's] efforts" to handcuff him was permissible use of force).

In this case, Officer Nunez had multiple grounds for tasing Baker. First, Baker repeatedly ignored commands from Officer Nunez. Before tasing Baker, Officer Nunez asked him at least twelve times to sit down on the stretcher. (Ex. A, Nunez Body Cam, 12:02:30-12:05:00). Paramedics repeatedly made similar requests. (Id., 12:01:25-12:02:30). Each time, Baker refused to comply. (Id., 12:01:25-12:05:00). Baker likewise failed to provide Officer Nunez with his driver's license when requested, choosing instead to attempt to reassemble and smoke a broken cigarette.

13

(Id., 12:04:48-12:05:00). Most significantly, while ignoring Officer Nunez's commands, Baker actually ***got back into the driver's seat of his vehicle***. (Id., 12:05:07-12:06:00). Had Baker been allowed to get back into his vehicle, in an apparent state of disorientation or intoxication, and potentially operate and move the vehicle (which itself could be used as a deadly weapon), or escape, danger would be increased to all surrounding the vehicle, including Officer Nunez, the paramedics, and nearby motorists. The video reflects that Officer Nunez attempted to remove Baker from the vehicle verbally and physically before resorting to the Taser. In light of the court's holding in Draper and Moore, Baker's repeated failure to comply with Officer Nunez's commands – especially given his efforts to get *into* a vehicle that Officer Nunez had the right to keep him *out of* pending further investigation – is certainly sufficient to justify tasing him.[4]

Additionally, the video of the incident stands in stark contrast to Baker's assertions that he was not "combative with police" or "endangering anyone" prior to

_____

[4] Baker's contention that he could not understand officers' commands does not change the analysis. See, e.g., McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1241 n.9 (11th Cir. 2003); Duncan v. Wade, --- F.Appx. ---, No. 20-13004, 2021 WL 1235721, at *2 (11th Cir. Apr. 2, 2021) ("Deputy Ward acted reasonably when he used force against Duncan after she did not obey his orders to get on the ground. Even accepting as true that Duncan did not hear Deputy Ward, nothing in the record indicates that Deputy Ward knew that…Acting under a reasonable-but-mistaken belief that Duncan had heard his instruction after Deputy Ward gave it three times, Deputy Ward was not required to 'wait and hope for the best' before making the split-second decision to tase Duncan.")

being tased. Baker, a large and imposing man, physically resisted Officer Nunez several times before being tased. (Doc. 1, ¶¶ 3, 32-34, 35). As Officer Nunez attempted to get Baker to lean against his vehicle, he shoved Officer Nunez and told him to "get off me man." (Ex. A, Nunez Body Cam, 12:05:35-12:05:42). Baker continued his verbal attacks, telling Officer Nunez to move so that he could "get in his mother fucking car." (Id., 12:05:42-12:06:00). Officer Nunez then grabbed Baker's arm, but Baker soon broke free of Officer Nunez's grip. (Id., 12:06:00-12:06:09). Importantly, by attempting to get in his vehicle and leave the scene, Baker posed an imminent threat not only to officers and paramedics, but also to other drivers. Finally, as Officer Nunez pulled Baker out of the vehicle, Baker shoved Officer Nunez. (Id., 12:06:30-12:06:34). Therefore, when Officer Nunez fired his Taser, Baker had already demonstrated a willingness to physically resist paramedics and Officer Nunez and was likely to cause further harm to others by getting back in his vehicle and leaving the scene. Based on Baker's violent tendencies, Officer Nunez was only further justified in tasing him.

In short, Officer Nunez did not immediately resort to tasing Baker; rather, over a period of four minutes (during which Officer Hose *was not even present*), he attempted to secure Baker's cooperation through numerous verbal commands and gripping Baker's arm. It was only after Baker got into his vehicle and shoved Officer Nunez that he was tased. Based on the totality of the circumstances surrounding

15

Officer Nunez's use of force, Baker simply cannot establish that Officer Nunez tasing him a single time constitutes excessive force. By extension, Baker cannot establish that Officer Hose – who was not even present – failed to prevent an unreasonable use of force by Officer Nunez.

C.     Officer Hose is entitled to qualified immunity.

At the very least, given the allegations of the complaint and the video footage supplied to the Court in connection with this motion, Officer Hose is to qualified immunity. The qualified immunity doctrine protects public officers and employees from liability "unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002). Indeed, "qualified immunity is the 'usual rule' for government actors sued in their individual capacities." Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001).[5]

---

[5]     The only prerequisite for raising the qualified immunity defense is a preliminary showing that the government official was acting within the broad scope of his discretionary authority when taking the allegedly unconstitutional actions. Williams v. Consol. City of Jacksonville, 341 F.3d 1261, 1267 (11th Cir. 2003). "To determine whether an official was engaged in a discretionary function, [courts] consider whether the acts the official undertook are of a type that *fell within the employee's job responsibilities*." Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004) (emphasis supplied). The video and the allegations of the complaint show that the matters at issue in this case arise out of alleged acts undertaken by Officer Hose while he was engaged in the performance of his official duties as a police officer for the City of Madison. Officer Hose has thus met his initial burden of showing he was engaged in a discretionary function; thus, the burden

Courts have applied a two-step test to determine whether officers acting within their discretionary authority may be deprived of qualified immunity. Andujar v. Rodriguez, 486 F.3d 1199, 1202 (11th Cir. 2007). The "threshold question" under that test is this: "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). If the answer to that question is "no" — in other words, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id. If the court finds that a constitutional violation has occurred, the inquiry continues. The question that must be answered at this next step of the analysis is whether "the constitutional right the defendant violated was 'clearly established' at the time he did it." Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004).

Supreme Court precedent has made it clear that there must be controlling authority involving factually similar circumstances to clearly establish law. As the Supreme Court has stated:

> An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or

shifts *to plaintiff* to show that qualified immunity *does not* apply. See Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010); McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007).

> constitutional question beyond debate. This exacting standard gives
> government officials breathing room to make reasonable but mistaken
> judgments by protect[ing] all but the plainly incompetent or those who
> knowingly violate the law.

City & Cnty. of San Francisco, Cal. v. Sheehan, ___ U.S. ___, 135 S. Ct. 1765, 1774

(2015). Only Supreme Court, Eleventh Circuit or Alabama Supreme Court case law

can 'clearly establish' constitutional rights. Amnesty Int'l, USA v. Battle, 559 F.3d

1170, 1184 (11th Cir. 2009).

Here, the "threshold question" in the qualified immunity analysis is answered

in the negative – *i.e.*, there is no basis for concluding that Baker's constitutional

rights were violated. As discussed in Section B above, before being tased, Baker

repeatedly disobeyed commands to sit down, lean against his vehicle, provide his

driver's license, and allow paramedics to provide medical care. Additionally, he

became verbally and physically combative with Officer Nunez. Accordingly,

Baker's constitutional rights were not violated when he was tased. Moreover, those

rights ***certainly*** were not violated by Officer Hose, who was not even present when

the Taser was utilized.

Even assuming (wrongly) that a constitutional violation occurred in this case,

qualified immunity would still protect Officer Hose from liability. Baker has not —

and cannot — produce any binding case law to show that Officer Hose acted in

violation of clearly established law under the precise circumstances he confronted.

See Mullenix v. Luna, ___ U.S. ___, 136 S. Ct. 305, 308 (2015) (requiring that

"'existing precedent must have placed the statutory or constitutional question beyond debate.'") (quoting Ashcroft v. Al-Kidd, 563 U.S. 731, 741 (2011)). Baker's principal argument appears to be that officers should have treated him differently due to his epilepsy. But a litany of cases precludes this sort of contention.

In Callwood v. Jones, the Eleventh Circuit held that officers were entitled to qualified immunity even though they applied a Taser 19 times to a naked man who they encountered walking down a street and who they believed was suffering from a medical condition – *i.e.*, excited delirium. 727 F. Appx. 552, 560 (11th Cir. 2018). Judge Carnes wrote that when the man was tased, he was "unrestrained and aggressively resisting the officers' attempts to stop and secure him"; thus, their actions "did not violate clearly established law," even though the subject ultimately died. Id. Furthermore, in Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1308 (11th Cir. 2009), the Eleventh Circuit held that deputies who tased and arrested an individual suffering from excited delirium were not deliberately indifferent to his medical needs even though they recognized that he was "acting crazy" and that deputies had called for a medical consult. Id. at 1300, 1307-08. The court observed that the use of a Taser was appropriate "given the countervailing government interest of safety and compliance," the fact that the conduct at issue was "violent, aggressive and prolonged," and the fact that the deputy warned the subject to stop her behavior to no avail. Id. at 1306; see also Long v. Slaton, 508 F.3d 576 (11th Cir. 2007) (where

the Court "stressed" the fact that the plaintiff was "mentally unstable" in justifying an officer's decision to use deadly force); Bussey-Morice v. Gomez, 587 F.Appx. 621, 629 (11th Cir. 2014) (upholding repetitive Taser usage in large part because the suspect was "belligerent, agitated, and out of his mind"); Nelson v. Lott, 330 F.Supp. 3d 1314, 1330 (N.D. Ala. 2018) (upholding tasing a noncompliant subject repeatedly until death where subject was assaultive with officers who were attempting to assist emergency room medical staff in administering sedative injection needed due to altered mental state); see also Estate of Hill v. Miracle, 853 F.3d 306, 316 (6th Cir. 2017) (holding that officers acted appropriately in tasing a diabetic plaintiff who was experiencing extreme low blood sugar, causing him to become combatant and confused, since he "needed to be subdued in order for medical personnel to render life-saving assistance").

For all of these reasons, Officer Hose is entitled to, at a minimum, qualified immunity.

## IV. Conclusion

For the foregoing reasons, Baker's complaint fails to state a claim against defendant Dion Hose under 42 U.S.C. § 1983. Accordingly, all claims against Officer Hose, including Count II of Baker's complaint, are due to dismissed with prejudice.

20

s/ David J. Canupp
David J. Canupp

LANIER FORD SHAVER & PAYNE, P.C.
P. O. Box 2087
2101 West Clinton Avenue, Suite 102 (35805)
Huntsville, AL 35804
Phone: 256-535-1100 / Fax: 256-533-9322
E-mail:  djc@LanierFord.com

Attorney for Defendant Dion Hose

## CERTIFICATE OF SERVICE

I certify that on this 19th day of April, 2021 I have filed the foregoing with the Clerk of the Court using the ECF System, which will send notification of such filing to those parties of record who are registered for electronic filing, and further certify that those parties of record who are not registered for electronic filing have been served by mail by depositing a copy of the same in the United States mail, first class postage prepaid and properly addressed to them as follows:

Curtis Baker
29570 Andrea Lane
Madison, AL 35756

s/ David J. Canupp
David J. Canupp